**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DONALD DOYLE | CIVIL ACTION  1:17-cv-09097 |
| Plaintiff, | |
| v. | |
| SYNERGETIC COMMUNICATION, INC. a/k/a SYNERGETIC COMMUNICATIONS, INC. d/b/a SYNCOM, ALLY FINANCIAL, INC. a/k/a ALLY FINANCIAL a/k/a BLUEYIELD a/k/a BLUEHARBOR FINANCIAL a/k/a CLEARLANE FINANCIAL SERVICES, ALLY SERVICING, LLC, and ALLY BANK | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

NOW COMES the Plaintiff, DONALD DOYLE ("Plaintiff"), by and through one of his attorneys, James C. Vlahakis of Sulaiman Law Group, Ltd., and brings this civil action as Class Action Complaint on behalf of himself, and a nationwide class of similarly situated individuals, pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3) and against SYNERGETIC COMMUNICATION, INC. a/k/a SYNERGETIC COMMUNICATIONS, INC. d/b/a SYNCOM ("Defendant" or "Synergetic") and ALLY FINANCIAL, INC. a/k/a ALLY FINANCIAL a/k/a BLUEYIELD a/k/a BLUEHARBOR FINANCIAL a/k/a CLEARLANE FINANCIAL SERVICES, ALLY SERVICING, LLC, and ALLY BANK as follows:

### Nature of the Action, Jurisdiction, Venue and Parties

1.    Plaintiff brings this civil action to pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227, the Fair Debt Collection Practices Act

1

("FDCPA"), 15 U.S.C. §1692, and the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 ILCS 505/1 et seq.

2.  Subject matter jurisdiction is conferred upon this Court by the TCPA, FDCPA, and 28 U.S.C. §§1331 and 1337, as the action arises under the laws of the United States.

3.  Plaintiff is a consumer and natural person over 18-years-of-age who, at all times relevant, resided in the Northern District of Illinois.

4.  Synergetic is a Texas corporation with its principal place of business located at 5450 NW Central, #220, Houston, Texas 77092.

5.  Synergetic's registered agent in Illinois is C T Corporation System located at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

6.  Synergetic is engaged in the business of collecting or attempting to collect, directly or indirectly, defaulted debts owed or due or asserted to be owed or due to others using the mail and telephone, including consumers in the State of Illinois.

7.  Synergetic is engaged in the business of collecting or attempting to collect, directly or indirectly, defaulted debts owed or due or asserted to be owed or due to consumers in the State of Illinois using the mail and telephone.

8.  ALLY FINANCIAL, INC. a/k/a ALLY FINANCIAL a/k/a BLUEYIELD a/k/a BLUEHARBOR FINANCIAL a/k/a CLEARLANE FINANCIAL SERVICES ("AFI") is a corporation organized under the laws of State of Delaware and a "person" as defined by 47 U.S.C. § 153(39).

9.  AFI is nationwide company, promoting itself in the businesses of banking, auto finance and home loans. See, https://www.ally.com/about/company-structure/

10.  AFI's website claims that it "[s]ervic[es] 18,000 dealers and more than 4 million of their customers in the U.S.

2

11. AFI is registered to do business in this state.

12. ALLY SERVICING, LLC ("ASL") is a corporation organized under the laws of State of Delaware.

13. ASL is a "person" as defined by 47 U.S.C. § 153(39).

14. ASL provides customer service and account servicing for AFI.

15. ALLY BANK ("AB") is a subsidiary of Defendant AFI, and on information and belief, is a Utah corporation with its principal place of business in Midvale, Utah.

16. AB is a "person" as defined by 47 U.S.C. § 153(39).

17. On information and belief, AB operates banks and provides consumers with automobile loans, among other products within this district.

18. AFI, ASL and AB are collectively referred to as the "Ally Defendants."

19. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d)(2), because the matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs, as each member of the proposed Class of thousands is entitled to at least $500 per call and to up to $1,500.00 in statutory damages under the TCPA for each unlawful pre-recorded or artificial voice message. For example, 10,000 calls in violation of the TCPA will result in $5,000,000 in damages at $500 per call. Alternatively, 3,334 illegal calls will result in over $5,000,0000 in damages at $1,500 per call.

20. Plaintiff alleges a national class, which will result in at least one Class member from different states.

21. Synergetic and the Ally Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time an action is commenced, which is the case here.

22.     The Court has supplemental jurisdiction over the state law ICFA claims under 28 U.S.C. §1367.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Synergetic and the Ally Defendants conduct business in the Northern District of Illinois and all of the events or omissions giving rise to the claims occurred within the Northern District of Illinois.

24.     As discussed below, Synergetic attempted to collect from Plaintiff a consumer debt allegedly owed to one or more of the Ally Defendants using letters addressed to Plaintiff in the Northern District of Illinois.

25.     As discussed below, Synergetic attempted to collect consumer debt allegedly owed to one or more of the Ally Defendants by placing phone calls to a telephone number associated with Plaintiff.

**Summary of the TCPA**

26.     Section (b)(1)(A)(iii) of the TCPA makes it unlawful to make any call to cellular telephone using any "automated telephone dialing system" or an "artificial or prerecorded voice" without the consent of the person being called.

27.     Section 227(a)(1) of the TCPA defines as "automated telephone dialing system" ("ATDS") to mean "equipment which has the capacity (A) to store or produce number to be called, using a random or sequential number generator; and (B) to dial such numbers."

28.     As alleged below, Synergetic placed phone calls to Plaintiff's cellular telephone phone calls to a telephone number associated with Plaintiff utilizing a ATDS or a predictive dialer.

29.     The Federal Communications Commission ("FCC") released a Report and Order on July 3, 2003 ("2003 FCC Order") which defined a "predictive dialer" as follows:

A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because the dialer simply hangs up when no telemarketer is free to take the call.

2003 FCC Order at fn. 31. A copy of the 2003 FCC Order can be found at

https://apps.fcc.gov/edocs_public/attachmatch/FCC-03-153A1.pdf

30. "A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists [caller] in predicting when an [agent] will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

31. The 2003 FCC Order explains how predictive dialers can be "set" to call consumers:

Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (i.e., the percentage of hang-up calls the system will allow). The higher the abandonment rate, the higher the number of hang-up calls. High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call. It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not be available when the consumer answers the phone.

2003 FCC Order at fn. 32.

32. The 2003 FCC Order discussed how predictive dialers attempt "to 'predict' the average time it takes for a consumer to answer the phone."

33. Paragraph 146 of the 2003 FCC Order states:

Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call. In attempting to "predict"

5

the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead air."

(footnote omitted).

34.     Paragraph 91 of the 2003 FCC Order discussed how the use of predictive dialers result in "dead air" or hang-ups:

the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to make a do-not-call request. Such calls are particularly burdensome for the elderly and disabled consumers.

35.     Paragraph 8 of the 2003 FCC Order discussed how predictive dialers "frequently abandon calls before a telemarketer is free to take the next call." 2003 FCC Order, Paragraph 8 (footnotes omitted).

36.     The FCC released a "Notice of Proposed Rulemaking and Memorandum Opinion and Order" ("2002 FCC Order") on September 18, 2002.  The 2002 FCC Order can be found at https://apps.fcc.gov/edocs_public/attachmatch/FCC-02-250A1.pdf

37.     The 2002 FCC Order described the number and types of consumer complaints that it had received regarding "autodialers" and "predictive dialers":

In 1991, the Commission received a total of 757 complaints regarding calls placed to subscribers by autodialers.  From June 2000 to December 2001, the Commission received over 1,500 inquiries about predictive dialing alone. In addition, the consumer alert titled "Predictive Dialing: Silence on the Other End of the Line" has received over 16,000 hits on the Commission's website since the alert was posted in February of 2001.

2002 FCC Order, ¶ 26 (footnote omitted).

38.     The 2002 FCC Order explained how predictive dialers result in "disconnected" calls:

In addition to automatically dialing numbers, predictive dialers are set up to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call. When a

consumer answers the telephone, a predictive dialer transfers the call to an available telemarketer. When a predictive dialer simultaneously dials more numbers than the telemarketers can handle, some of the calls are disconnected. The consumer may hear silence on the line as the call is being transferred or a "click" as the call is disconnected.

2002 FCC Order, ¶ 26 (footnote omitted).

39.     The 2002 FCC Order identified why "computerized calls" annoy citizens:

"Computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall . . . [O]wning a telephone does not give the world the right and privilege to assault the consumer with machine-generated telephone calls." 137 CONG. REC. S9874 (July 8, 1991)(statement of Sen. Hollings).

2002 Order, fn. 90.

40.     The Court may take judicial notice that the FCC released a Declaratory Ruling on January 4, 2008 ("2008 FCC Ruling").  A copy of the 2008 FCC Ruling can be found at https://apps.fcc.gov/edocs_public/attachmatch/FCC-07-232A1.pdf

41.     The 2008 FCC Ruling "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."  2008 FCC Ruling at ¶ 12.

42.     The 2008 FCC Ruling states that it "first sought comment on predictive dialers in 2002 and asked whether using a predictive dialer is subject to the TCPA's autodialer restrictions."  See, 2008 FCC Ruling at ¶ 13.

43.     The 2008 FCC Ruling described the 2002 FCC Order as follows:

The Commission found that, based on the statutory definition of "automatic telephone dialing system," the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress.  The Commission noted that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The

Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology.

2008 FCC Ruling at ¶ 13 (footnotes omitted).

44. "A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists [caller] in predicting when an [agent] will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

45. The 2008 FCC Ruling states that creditors are "responsible for demonstrating that the consumer provided prior express consent."

46. According to 2008 FCC Ruling, it is the burden of creditors and debt collectors to demonstrate consent to call a cellular number with an ATDS:

> To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and prerecorded message calls, we conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent. The creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications. Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent.

2008 FCC Ruling, ¶ 10 (footnote omitted).

**Facts Supporting Causes of Action**

47. At all times relevant, Plaintiff was the sole subscriber, owner, possessor, and operator of the cellular telephone number (312)520-2869.

48. Plaintiff has paid for this cellular telephone and its services.

49. In May 2013, Plaintiff financed the purchase of a motor vehicle (the "subject vehicle") through Ally.

50. Plaintiff's purchase of the subject vehicle resulting in him in being indebted for the subject vehicle.

51. Plaintiff subsequently defaulted on the subject vehicle, resulting in the "subject debt."

52. Unable to keep up with the payments towards the subject debt, Plaintiff eventually traded in the subject vehicle in or about January 2015.

53. At the time Plaintiff traded in the subject vehicle, he received $17,000 through the trade in value of the subject vehicle.

54. Of the $17,000 received through the trade-in of the subject vehicle, $14,878.20 of that amount was paid to Ally to satisfy the subject debt.

55. By virtue of trading in the subject vehicle, all debts incurred and monies owed at the time of the trade-in were satisfied in full as of January 19, 2015.

56. In conversations with call representatives of one or more of the Ally Defendants, Plaintiff explained that he did not owe any money toward the subject debt and the subject vehicle.

57. Despite informing call representatives of one or more of the Ally Defendants that he did not owe any money toward the subject debt and the subject vehicle, one or more of the Ally Defendants sent the subject debt to Synergetic for collection.

58. In or around October 2016, Plaintiff began receiving calls on his cellular telephone number from Synergetic (hereafter "Defendant") demanding payment on the subject debt.

59. The Ally Defendant or Defendants who transmitted the subject debt to Defendant should never have transmitted the subject debt to Defendant after Plaintiff

told a representative of one or more of the Ally Defendants that he did not owe any money toward the subject debt and the subject vehicle.

60.     Defendant should have known that it was collecting a disputed or unlawful amount because it had constructive knowledge that Plaintiff having told call representatives of one or more of the Ally Defendants that he did not owe any money toward the subject debt and the subject vehicle.

61.     In or around October 2016, Plaintiff began receiving calls on his cellular telephone number from Defendant demanding payment on subject vehicle.

62.     Defendant should not have called Plaintiff to collect the subject debt because it has constructive knowledge that Plaintiff told a representative of one or more of the Ally Defendants that he did not owe any money toward the subject debt and the subject vehicle.

63.     Alternatively, Defendant should not have continued to called Plaintiff to collect the subject debt after Plaintiff told a representative of Defendant that he did not owe any money toward the subject debt and the subject vehicle.

64.     Prior to Defendant's calls to Plaintiff's cellular telephone number, Plaintiff had no prior business relationship with Defendant.

65.     Prior to Defendant's calls to Plaintiff's cellular telephone number, Plaintiff had no knowledge of Defendant.

66.     Prior to Defendant's calls to Plaintiff's cellular telephone number, Plaintiff had never provided his cellular telephone number to Defendant.

67.     Prior to Defendant's calls to Plaintiff's cellular telephone number, Plaintiff never impliedly consented to Defendant's phone calls.

68.     Prior to Defendant's calls to Plaintiff's cellular telephone number, Plaintiff never expressly consented to Defendant's phone calls.

69.    On information and belief, Defendant performed a skip trace of Plaintiff, which resulted in Defendant obtaining Plaintiff's cellular telephone number.

70.    "Skip-tracing" involves debt collectors conducting informational inquiries of consumers by way of credit reports or other public record searches that are often undertaken to obtain telephone numbers of consumers.

71.    After Defendant began calling Plaintiff's cellular telephone, Plaintiff answered one of Defendant's calls and spoke with a live person (a "call representative").

72.    During this live interaction, Plaintiff told the call representative to stop calling him.

73.    Defendant's account notes reflect a live interaction with Plaintiff and the call representative.

74.    Defendant has a call recording of Plaintiff's interaction with the call representative.

75.    On information and belief, Defendant's account notes reflect that the call representative entered a numeric code to document Plaintiff's request to stop calling him.

76.    On information and belief, Defendant's account notes reflect that the call representative entered a letter code to document Plaintiff's request to stop calling him.

77.    On information and belief, Defendant's account notes reflect that the call representative entered an abbreviation to document Plaintiff's request to stop calling him.

78.    On information and belief, Defendant's account notes reflect that the call representative entered an acronym to document Plaintiff's request to stop calling him.

79.    On information and belief, Defendant's account notes reflect that the call representative typed a summary of Plaintiff's request to stop calling him

80. After Plaintiff to the call representative to stop calling him, Defendant called Plaintiff's cellular phone at least 5 times after Plaintiff first told the call representative to stop calling him.

81. After Plaintiff to the call representative to stop calling him, Defendant called Plaintiff's cellular phone at least 10 times after Plaintiff first told the call representative to stop calling him.

82. After Plaintiff to the call representative to stop calling him, Defendant called Plaintiff's cellular phone at least 15 times after Plaintiff first told the call representative to stop calling him.

83. After Plaintiff to the call representative to stop calling him, Defendant called Plaintiff's cellular phone at least 20 times after Plaintiff first told the call representative to stop calling him.

84. After Plaintiff to the call representative to stop calling him, Defendant called Plaintiff's cellular phone at least 30 times after Plaintiff first told the call representative to stop calling him.

85. After Plaintiff to the call representative to stop calling him, Defendant called Plaintiff's cellular phone over 30 times after Plaintiff first told the call representative to stop calling him.

86. Defendant intentionally called Plaintiff on numerous occasions by calling Plaintiff's cellular phone in an attempt to collect the subject debt after Plaintiff told the call representative to stop calling him.

87. Defendant intentionally called Plaintiff on numerous occasions by calling Plaintiff's cellular phone in an attempt to collect the subject debt after Plaintiff revoked consent to be contacted on his cellular phone.

88.     Defendant called Plaintiff's cellular phone with knowledge that Plaintiff did not owe the subject debt.

89.     During the calls that Plaintiff did answer, Plaintiff was greeted by a few seconds of "dead air" while Defendant's telephone system attempted to connect Plaintiff to a live agent.

90.     During the calls that Plaintiff did answer, there would be an approximate three-second pause between the time Plaintiff said "hello," and the time that a live representative joined the call and answered Plaintiff.

91.     Based on the lack of prompt human response during the phone calls in which Plaintiff answered, Defendant used a predictive dialing system to place calls to Plaintiff's cellular telephone.

92.     Upon information and belief, the predictive dialing system employed by Synergetic transfers the call to a live agent once a human voice is detected, thus resulting in a pause after the called party speaks into the phone.

93.     During various call attempts, Plaintiff had to ask "hello" more than once before someone responded.

94.     Defendant knowingly refused to abide by Plaintiff's request to stop calling and as a result, Defendant's calls to his cellular phone after his do not call request were unlawful.

95.     Defendant knowingly refused to abide by Plaintiff's request to stop calling and as a result, Defendant's calls to his cellular phone after his do not call request constituted unlawful harassment, abuse and/or intimidation.

96.     On information and belief, one or more of Defendant's calls to Plaintiff's cellular telephone included an artificial or prerecorded voice message.

97.     On information and belief, one or more of Defendant's calls to Plaintiff's cellular telephone included an artificial or prerecorded voice message where the message did not state that the call was from "SYNERGETIC COMMUNICATION, INC."

98.     On information and belief, one or more of Defendant's calls to Plaintiff's cellular telephone included an artificial or prerecorded voice message where the message said that the call was from "SYNERGETIC COMMUNICATION."

99.     On information and belief, one or more of Defendant's calls to Plaintiff's cellular telephone included an artificial or prerecorded voice message where the message said that the call was from "SYNERGETIC."

100.    Defendant's phone calls to Plaintiff after it was told to stop calling him have disrupted Plaintiff's daily life, emotional health and general well-being.

101.    Defendant's phone harassment have caused Plaintiff actual harm, including but not limited to, invasion of privacy, nuisance, intrusion upon and occupation of Plaintiff's cellular telephone capacity, wasting Plaintiff's time and causing risk of injury by interrupting and distracting Plaintiff, the increased risk of personal injury due to disturbance and distraction caused by the phone calls, aggravation that accompanies unsolicited telephone calls, emotional distress, mental anguish, anxiety, loss of concentration, diminished value and utility of telephone equipment and telephone subscription services, the loss of battery charge, and the per-kilowatt electricity costs required to recharge his cellular telephone as a result of increased usage of his telephone services.

102.    In addition, each time Defendant placed a telephone call to Plaintiff, Defendant occupied Plaintiff's telephone number such that Plaintiff was unable to receive other phone calls.

103.    Concerned about the violations of his rights and invasion of his privacy, Plaintiff was forced to seek the assistance of counsel to file this action to compel Defendant to cease its unlawful conduct, thus incurring costs and expenses.

104.    Defendant called more than 40 persons under similar circumstances where the circumstances are as follows:  (a) autodialed and/or predictively dialed telephone calls to debtors; (b) after debtors told Defendant to stop calling; (c) Defendant's account records document do not call requests with one or more of the following designations – (i) letter codes; (ii) numeric codes; (iii) abbreviations; (iv) acronyms and/or (v) typed summaries; and (d) Defendant's account records and outbound call records document autodialed and/or predictively dialed calls to the same telephone numbers after do not call requests were documented.

105.    Defendant called more than 40 persons under similar circumstances where the circumstances are as follows:  (a) telephone calls to debtors that utilized artificial or prerecorded voice messages; (b) after debtors told Defendant to stop calling; (c) Defendant's account records document do not call requests with one or more of the following designations – (i) letter codes; (ii) numeric codes; (iii) abbreviations; (iv) acronyms and/or (v) typed summaries; and (d) Defendant's account records and outbound call records document utilized artificial or prerecorded voice messages to the same telephone numbers after do not call requests were documented.

106.    On December 19, 2016, Defendant sent Plaintiff a dunning letter demanding payment of the subject debt in the amount of $1,300.45, listing "Ally" as the original creditor.

107.    A copy of the letter to Plaintiff is pasted below and the entire letter is attached as Exhibit A.



108. The December 19, 2016, Synergetic's letter failed to properly identify the legal name of the creditor.

109. On information and belief, consumer debts were often transferred between the Ally Defendants in 2016, thus adding to any confusing regarding the true creditor of the subject debt.

110. Accordingly, Synergetic's December 19, 2016, did not identify, to an unsophisticated consumer, the name of the creditor who allegedly owned the subject debt.

111. At the time Synergetic sent Plaintiff the December 19, 2016, letter, Plaintiff did not owe the subject debt.

**Count I – Individual Claim vs. Synergetic For Violations of the FDCPA**

112. Plaintiff restates and realleges the above paragraphs as though fully set forth herein.

113. Plaintiff is a "consumer" as defined by FDCPA §1692a(3).

114. Upon information and belief, the subject debt that Defendant was attempting to collect arose primarily for family, personal or household purposes, and thus is an alleged "consumer debt" as defined by FDCPA §1692a(5).

115. Synergetic is a "debt collector" as defined by §1692a(6) because it regularly collects debts and uses the mail and/or the telephones to collect delinquent consumer accounts.

116. Synergetic's communications to Plaintiff were made in connection with a collection of the subject debt.

117. Synergetic used telephone systems and the U.S. Mail to attempt to collect the subject debt and, as such, engaged in "communications" as defined in FDCPA §1692a(2).

### a. Violations of FDCPA §1692d

118. Synergetic violated §1692d by engaging in abusive, harassing, and oppressive conduct by calling Plaintiff's cellular phone seeking to collect the subject debt with knowledge that Plaintiff did not owe the subject debt.

119. Synergetic violated §1692d by engaging in abusive, harassing, and oppressive conduct by calling Plaintiff's cellular phone seeking to collect the subject debt after Plaintiff demanded that the calls in relation to the subject debt cease.

120. Synergetic violated §1692d(5) by causing Plaintiff's cellular phone to ring repeatedly and continuously in an attempt to engage Plaintiff in conversations regarding the collection of the subject debt with the intent to annoy, abuse, or harass Plaintiff.

121. Specifically, Synergetic placed or caused to be placed no less than 30 harassing phone calls to Plaintiff's cellular phone through the present day to Plaintiff's cellular phone, using an ATDS without his prior consent.

### b.     Violation of  FDCPA §1692e

122.   Synergetic violated §1692e by using false, deceptive, and misleading means to collect the subject debt.

123.   Synergetic repeatedly and falsely attempted to make Plaintiff believe that he owed the subject debt when the subject debt was satisfied as of January 19, 2015.

124.   Synergetic violated §1692e(2) §1692e(10) by falsely and/or deceptively misrepresenting the character, amount, and legal status of the subject debt by attempting to collect the subject when it was no longer owed or collectible.

### c.     Violation of  FDCPA §1692f

125.   Synergetic violated §1692f by employing unfair and unconscionable means to collect the subject debt by placing harassing and voluminous phone calls to Plaintiff's cellular phone attempting to intimidate Plaintiff into paying the subject debt.

126.   Upon information and belief, Synergetic systematically attempts to collect debts through harassing conduct and has no procedures in place to assure compliance with the FDCPA.

127.   As stated above, Plaintiff was harmed by Defendant's violations of the FDCPA.

**WHEREFORE**, Plaintiff DONALD DOYLE requests that this Honorable Court:

a.     Declare that the practices complained of herein are unlawful and violate the aforementioned Sections of the FDCPA;

b.     Award Plaintiff statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

c.     Award Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

d.     Award any other relief as this Honorable Court deems just and appropriate.

**Count II – Class Claim vs. Synergetic For Violations of the FDCPA**

128. Plaintiff restates and realleges the above paragraphs as though fully set forth herein.

129. Synergetic's December 19, 2016 letter to did not adequately identify the name of the subject creditor. See Exhibit A.

130. Synergetic used telephone systems and the U.S. Mail to attempt to collect the subject debt and, as such, engaged in "communications" as defined in FDCPA §1692a(2).

**a.    Violation of  FDCPA §1692e**

131. Synergetic violated §1692e by using false, deceptive, and misleading means to collect the subject debt.

132. Synergetic violated §1692e(10) by falsely a deceptively failing to properly identify the creditor of the subject debt on the face of the its December 19, 2016.

**b.    Violation of  FDCPA §1692f**

133. Synergetic violated §1692f by employing unfair and unconscionable means to collect the subject debt by failing to properly identify the creditor of the subject debt on the face of the its December 19, 2016.

**c.    Violation of  FDCPA §1692g**

134. Synergetic violated §1692g by failing to properly identify the creditor of the subject debt on the face of the its December 19, 2016.

135. Synergetic mailed out hundreds of similar letters to putative class member within one year prior to the filing of this Civil Action.

136. As stated above, Plaintiff and a putative class was harmed by Defendant's violations of the FDCPA.

137.   The proposed class can be defined as all persons with the United States who were sent a collection letter from Synergetic on behalf of "Ally" within one year of the filings of this Civil Action.

**WHEREFORE**, Plaintiff DONALD DOYLE requests that this Honorable Court:

a.   Declare that the practices complained of herein are unlawful and violate the aforementioned Sections of the FDCPA

b.   Award Plaintiff and the putative class members statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

c.   Award Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

d.   Award any other relief as this Honorable Court deems just and appropriate.

### Count III – TCPA Class Action vs. Synergetic and the Ally Defendants

138.   Plaintiff restates and realleges the above paragraphs as though fully set forth herein.

139.   As alleged above, one or more of the Ally Defendants was/were told by Plaintiff to stop calling him.

140.   Thereafter, one or more of the Ally Defendants sent the subject debt to Synergetic for collection.

141.   Synergetic placed or caused to be placed non-emergency calls, including but not limited to the calls referenced above, to Plaintiff's cellular telephone using and ATDS or predictive dialer without his prior consent in violation of 47 U.S.C. §227 (b)(1)(A)(iii).

142.   As alleged above, Synergetic was told by Plaintiff to stop calling him.

143.   Despite Plaintiff's instruction to stop calling him, on information and belief, one or more of the Ally Defendants transmitted Plaintiff's cellular telephone number to Defendant.

144.   On information and belief, the Ally Defendant or Ally Defendants that transmitted Plaintiff's cellular telephone number to Synergetic did not inform Synergetic that one of more of the Ally Defendants was/were told by Plaintiff to stop calling him.

145.   Alternatively, Synergetic obtained Plaintiff's cellular number through "skip tracing," and thus never had any prior consent to place phone calls to Plaintiff's cellular phone.

146.   Synergetic violated the TCPA by placing no less than 30 harassing phone calls to Plaintiff's cellular phone through the present day, using an ATDS without his prior express consent.

147.   Moreover, as plead above, Plaintiff demanded that all calls regarding the subject debt cease being placed to his cellular phone.

148.   Plaintiff was harmed by Synergetic's unwanted and unsolicited calls to his cellular phone, which were in relation to a debt that Plaintiff did not owe.

149.   Upon information and belief, Synergetic's corporate policy and procedures are structured as to continue to call individuals like Plaintiff, despite Plaintiff never having consented or permitted the calls, nor even having provided his cellular telephone number to Synergetic.

150.   Upon information and belief, Synergetic knew its collection practice were in violation of the TCPA, yet continued to employ them to increase profits at Plaintiff's expense.

151.   Synergetic, through its agents, representatives, affiliates and/or employees acting within the scope of their authority acted intentionally in violation of 47 U.S.C. §227(b)(1)(A)(iii).

152.   Pursuant to 47 U.S.C. §227(b)(3)(B), Synergetic is liable to Plaintiff for a minimum of $500 per call.

153.    Pursuant to 47 U.S.C. §227(b)(3)(C), Synergetic's willful and knowing violations of the TCPA should trigger this Honorable Court's ability to triple the damages to which Plaintiff is otherwise entitled to under 47 U.S.C. §227(b)(3)(C).

154.    The 2008 FCC Ruling states that creditors are liable for a debt collector's violation of the TCPA:

> a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.

2008 FCC Ruling, ¶ 10 (footnote omitted).

155.    Accordingly, one or more of the Ally Defendants is liable to Plaintiff and the putative class members for Synergetic's violations of the TCPA.

156.    The proposed class can be defined as:

> All persons in the United States (a) whose cellular telephone number were called by Synergetic (b) within four years of the filing of this civil action (c) where Synergetic's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC.

157.    Because Synergetic bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above proposed class definition does not contain the reference to whether it had consent to call the cellular numbers in the manner described in the above paragraphs.

158.     Further, because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above proposed definition is not defined to reference revocation of consent.

**WHEREFORE**, Plaintiff DONALD DOYLE requests that this Honorable Court:

a.    Declare Defendant Synergetic's phone calls to Plaintiff and the putative class members to be violations of the TCPA;

b.     Award Plaintiff damages of at least $500 per phone call and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and

c.     Award any other relief this Honorable Court deems equitable and just.

**Count IV – Violations of the IFCA vs. Synergetic and the Ally Defendants**

159.   Plaintiff restates and realleges the above paragraphs as through fully set forth herein.

160.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

161.   Plaintiff is a "person" and a "consumer" as defined in ICFA, 815 ILCS 505/(c) and (e) respectively.

162.   Each putative class member is a "person" and a "consumer" as defined in ICFA, 815 ILCS 505/(c) and (e) respectively.

163.   Upon information and belief, one or more of the Ally Defendants purposefully failed to inform Synergistic when Plaintiff and other putative class members revoked consent to be called in connection with their subject debts.

164.   Synergetic's collection calls to Plaintiff and the putative class members on behalf of creditors, including, but not limited to one or more of the Ally Defendants, are "trade" and "commerce" as defined by 815 ILCS 505/1(f) of the ICFA.

165.   Synergetic and one or more of the Ally Defendants are engaged in commerce in the State of Illinois with regard to Plaintiff and other putative class members.

166. Synergetic specializes in debt collection, on behalf of creditors, including, but not limited to one or more of the Ally Defendants, which is an activity within the stream of commerce and utilized in its regular course of business.

167. Synergetic violated 815 ILCS 505/2 by engaging in an unfair and deceptive act or practice in contacting Plaintiff and the putative class members with and ATDS and/or predictive dialer despite revocation of consent by Plaintiff and the putative class members.

168. It was unfair for Synergetic to contact Plaintiff and the putative class members with and ATDS and/or predictive dialer when it did not have permission or consent to do so.

169. It was unfair for Synergetic to contact Plaintiff and the putative class members with and ATDS and/or predictive dialer when creditors, including, but not limited to one or more of the Ally Defendants did not have permission or consent to do so.

170. It was unfair for one or more of the Ally Defendants to ignore Plaintiff and the putative class members' requests to no longer be called by placing the subject debts with Synergetic to collect.

171. Plaintiff and the putative class members specifically requested that all calls regarding the subject debt to their cellular phone cease.

172. Synergetic and one or more of the Ally Defendants ignored Plaintiff and the putative class members' do not call requests and continued to contact Plaintiff and the putative class members on a regular basis.

173. The frequency in which Synergetic called Plaintiff and the putative class members harassed them.

174. It was unfair and deceptive for for one or more of the Ally Defendants to use Synergetic to collect the subject debt from Plaintiff and the putative class members through harassing phone calls to his cellular phone attempting to induce them into making a payment on the subject debt.

175. It was unfair for and the putative class members to place or cause to be placed no less than 30 harassing phone calls to Plaintiff's cellular phone through the present to Plaintiff's cellular phone, using an ATDS without his prior consent to collect a debt that was not owed.

176. On information and belief, Synergetic called putative class members in a similar manner.

177. It was unfair for Synergetic to continue placing calls to Plaintiff and putative class members after they specifically demanded to no longer receive any calls in relation to the subject debts.

178. Defendants' unfair conduct is inherently oppressive as Plaintiff and putative class members had no choice but to submit to the harassing phone calls to their cellular phones.

179. Moreover, Defendants' unfair conduct is against public policy because it needlessly subjects consumers to unsolicited calls, resulting in a significant harm in the form of invasion of privacy and nuisance.

180. Upon information and belief, Synergistic systematically places unsolicited and harassing phone calls to consumers in Illinois in order to aggressively collect debts in default or assumed to be in default to increase its profitability at the consumers' expense.

181. Upon information and belief, placing unsolicited and harassing phone calls to Illinois consumers by Synergetic for one or more of the Ally Defendants and

other creditors is an unfair business practice willfully employed by Synergetic and was done on a large scale.

182.    Additionally, Defendants' unlawful and unfair debt collection efforts gives it an unfair competitive advantage over businesses that collect debts lawfully (companies who legally place calls with prior consent, as authorized, and who lawfully cease calling upon requests to stop).

183.    As alleged above, Plaintiff and putative class members were substantially harmed by Defendants' misconduct.

184.    An award of punitive damages is appropriate because Defendants' conduct described above was outrageous, willful and wanton, showed a reckless disregard for the rights of the Plaintiff and putative class members, generally, and Plaintiff and putative class members had no choice but to submit to the harassing phone calls.

185.    The proposed class can be defined as:

All persons in the United States (a) whose cellular telephone number were called by Synergetic (b) within three years of the filing of this civil action (c) where Synergetic's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC (d) after Synergetic was told to stop calling said persons.

186.    The proposed subclass can be defined as:

All persons in the United States (a) whose cellular telephone number were called by Synergetic to collect a debt owed to Ally (b) within three years of the filing of this civil action (c) where Synergetic's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC (d) after Ally was told to stop calling said persons.

**WHEREFORE**, Plaintiff DONALD DOYLE requests that this Honorable Court:

a.    Enter judgment in Plaintiff and putative class members' favor and against Defendant;

b.    Award Plaintiff and putative class members actual damages in an amount to be determined at trial;

c.    Award punitive damages in an amount to be determined at trial;

d.    Award Plaintiff his reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a(c); and

e.    Award any other relief this Honorable Court deems equitable and just.

### The Elements of FRCP 23 Are Met

284.    Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

285.    The putative FCPA and TCPA class members can be identified through Defendant's account records.  *See, e.g., In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d 380, 397 (3d Cir. 2015) (defendant "possesse[d] all of the relevant bank records needed to identify the putative class members").

286.    Third-parties like Neustar offer TCPA compliance services methods to identify persons before they are called:



See https://www.neustar.biz/risk/compliance-solutions/tcpa

287. Excluded from the Classes are: (a) Defendant's current and former employees, officers, and directors; (b) any Judge to whom this case is assigned and the Judge's immediate family; (c) any person who executes and files a timely request for exclusion from the Class; (d) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (e) the legal representatives, successors and assigns of any such excluded person.

288. Plaintiff reserves the right to modify the class definitions to negate any efforts by Defendant to suggest that the above classes are failsafe classes.

289. Plaintiff seeks injunctive relief to preclude Defendant from calling him and others similarly situated in violation of the TCPA and FDCPA.

**A. Numerosity**

290. The element of numerosity is satisfied because Defendant called hundreds of persons like Plaintiff (a) through dialing technology prohibited by the TCPA (either an ATDS, predictive dialer, prerecorded messages and/or artificial messages) and (b) without consent of the person called.

291. Accordingly, the joinder of all members of the Class is impracticable.

292. Plaintiff believes there are thousands of Class members based upon Defendant's standing as one of the Nation's largest finance companies.

**B. Commonality and Predominance**

293. The elements of is commonality and predominance are satisfied.

294. As to the TCPA based classes, commonality exists because Defendant acted in a common manner toward Plaintiff and the proposed class members by calling Plaintiff and the proposed class members in the same way: (a) through dialing technology prohibited by the TCPA (either an ATDS, predictive dialer, prerecorded messages and/or artificial messages) and (b) without consent of the person called.

295. There are several questions of law and fact common to the claims of Plaintiff and members of the TCPA classes, including:

a. Whether the calls placed to the cellular phones belonging to Plaintiff and Class members are violations of the TCPA;

b. Whether Defendant's actions in continuing to place autodialed and automated calls after consent has been revoked violates the TCPA;

c. Whether Defendant's conduct described herein was part of a pattern of noncompliance with the TCPA;

d. How Defendant was identified in any prerecorded or artificial voice messages; and

e. Whether Defendant's conduct described herein was intentional.

166. Common questions predominate over any individual issues.

167. There are several questions of law and fact common to the claims of Plaintiff and members of the FDCPA classes, including: whether the dialing systems used by Defendants qualify as automated telephone dialing systems under the TCPA; whether messages used by Defendant qualify as artificial or prerecorded messages under the TCPA; whether the calls violated the TCPA and Sections 1692d, 1692e and 1692f of the FDCPA and ICFA; whether Defendant can demonstrate consent; and whether Defendant's conduct described herein was intentional so as to warrant treble damages.

### C. Typicality

168. Plaintiff's claims are typical of the claims of the proposed Class, as the call that Defendant placed to his cellular phone (after he revoked any purported consent to be contacted by Defendant on his cellular phone) were the same or substantially similar to those received by the proposed class members.

169. Plaintiff's and the proposed class members' claims all arise from the same operative facts and are based on the same legal causes of action.

170. Plaintiff and each of the proposed class member are all subject to the same illegal calling techniques employed by Defendant.

**D. Appropriateness and Superiority**

171. A class action is an appropriate method for the fair and efficient adjudication of this controversy, and superior to other available methods for the fair and efficient adjudication of this controversy.

172. The common questions of law and fact enumerated above predominate over questions affecting only individual Class members.

173. The likelihood that individual Class members will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, as well as the absence of a fee shifting mechanism.

174. As such, the expense and burden of individual litigation would make it impracticable for proposed Class members to prosecute their claims individually.

175. The trial and the litigation of Plaintiff's and Class members' claims are manageable.

**E. Plaintiff and His Counsel Will Adequately Represent the Class**

176. Plaintiff will fairly and adequately represent and protect the interests of the Class.

177. Plaintiff has no interest antagonistic to those of the Class.

178. Defendant does not have any defenses unique to Plaintiff.

179. Neither Plaintiff nor his counsel will have any interests that might cause them not to vigorously pursue this claim.

180. Plaintiff's lead attorney (James C. Vlahakis) is an experienced consumer class action litigator.

181.    Mr. Vlahakis has defended hundreds of consumer-based claims and since 1998.

182.    Mr. Vlahakis has litigated over three dozen TCPA based putative class actions

183.    Based upon nearly twenty years of experience, Mr. Vlahakis understands the defense typically utilized by creditors and debt collectors in TCPA litigation.

184.    In conjunction with counsel for the class members, Mr. Vlahakis obtained Court approval has obtained approval of various TCPA class actions.  *See, e.g., In Re Capital One Telephone Consumer Protection Act Litigation*, 2012-cv-10064 (N.D. Ill.) ($75 million dollar ATDS based settlement); *Prater v. Medicredit, Inc.*, 2014-cv-0159 ($6.3 million dollar ATDS wrong party settlement); *INSPE Associates v. CSL BIotherapries, Inc.* (N.D. Ill.) ($3.5 million fax based settlement).

185.    Mr. Vlahakis has successfully defeated a TCPA based class certification motion in *Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013).

186.    Mr. Vlahakis also decertified a previously certified TCPA class action in *Pesce v. First Credit Services, Inc.*, 2012 U.S. DIst. LEXIS 188745 (N.D. Ill. June 6, 2012).

187.    Mr. Vlahakis (as a former consumer class action defense attorney and in conjunctive with class counsel) has obtained court approval of dozens of FDCPA class actions.

188.    As a former consumer class action defense attorney, Mr. Vlahakis has a vast level of knowledge that will assist him in advocating for Plaintiff and the putative class members.  Additionally, Mr. Vlahakis has successfully ascertained the identities of putative class members individually and in conjunction with industry experts.

189.     Finally, Mr. Vlahakis has filed two petitions for declaratory relief before the Federal Communications Commission.

190.     Plaintiff's other counsel are highly competent and experienced class action attorneys.

**F.  Injunctive and Declaratory Relief Are Warranted**

191.     FRCP 23(b)(2) provides that injunctive and declaratory relief are proper where "the party opposing the class has acted or refused to act on grounds that apply generally to the class."

192.     Here, the above violations apply generally to the proposed classes.

**G.  Plaintiff and the Class Have Suffered Legally Cognizable Injuries**

193.     In discussing whether a statutory violation affords a person Article III standing to assert a cause of action in federal court, the Supreme Court recognized that Congress has the power to enact laws to elevate concrete harm "to the status of legally cognizable injuries." *Spokeo, Inc., v. Robbins*, 136 S. Ct. 1540, 1549 (2016).

194.     The *Spokeo* Court also recognized that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Id.*

195.     *Spokeo* also recognized that "both history and the judgment of Congress play important roles" in deciding whether a statutory violation is a concrete, de facto injury." *Id.*

196.     After the Supreme Court's June 17, 2016, decision in *Spokeo*, a majority of courts have held that TCPA alleged demonstrate concrete and legally cognizable harm. *See, e.g., Susinno v. Work Out World Inc.*, 862 F.3d 346, 348 (3d Cir. 2017) (holding that Article III standing existed where a TCPA plaintiff received a a "single solicitation" to her cell phone from a fitness company that resulted in the "receipt of [a] call and voicemail"); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding

32

two unwanted text messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect"); *Hossfeld v. Compass Bank*, 2017 U.S. Dist. LEXIS 182571, *14-15 (N.D. Al. Nov. 3, 2017) ("Mr. Hossfeld has undoubtedly cleared the particularity hurdle and asserted a personal connection to the harm claimed that is sufficient to establish this prong of the standing requirement. The two unsolicited calls described in Ms. Hossfeld's first amended complaint were made to his personal cell phone number. (Doc. 12 at 4 ¶ 17). Mr. Hossfeld further alleges how those automatically-dialed calls impacted him personally—they temporarily deprived him from being able to use his cell phone, invaded his privacy, wasted his time, and reduced his cell phone's battery's life. (Doc. 12 at 7 ¶ 40)."); *Etzel v. Hooters of Am., LLC*, 223 F. Supp. 3d 1306, 1311, 1312 (N.D. Ga. 2016) (rejecting application of *de minimis* rule to "a lone text message after withdrawal of consent" (internal quotation marks omitted) given "the [unambiguous] language of the TCPA . . . that a violation can occur from a single call" under § 227(b)(1)(A) in contrast to § 227(c)(5) which requires more than one call); *Cabiness v. Educ. Fin. Solutions, LLC*, 2016 U.S. Dist. LEXIS 142005, 2016 WL 5791411, at *5-6 (N.D. Cali. Sept. 1, 2016)(a violation of the TCPA "is sufficient on its own to constitute an injury in fact" because "[e]very unconsented call through the use of an ATDS to a consumer's cellular phone results in actual harm"); *Cour v. Life360, Inc.*, 2016 U.S. Dist. LEXIS 98945, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016) (finding concrete injuries where plaintiff alleged he received one text message in violation of the TCPA).

**WHEREFORE**, for the above reasons, this Court should declare Defendants' misconduct unlawful and enjoin Defendants from further violating the TCPA, FDCPA and ICFA.

**Plaintiff demands trial by jury.**

## Document Preservation Demand

Plaintiff requests that Defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, or file associated with Plaintiff, and any account or number or symbol relating to Plaintiff.

Plaintiff also demands that Defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to the proposed class members, the events described herein, any third party associated with any telephone call, campaign, account, or file associated with the proposed class member, and any account or number or symbol relating to the proposed class members.

These materials are likely very relevant to the litigation of this claim. If Defendants are aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendants request that such third party also take steps to preserve the materials.

This demand shall not narrow the scope of any independent document preservation duties of Defendants.


Respectfully submitted,

*Plaintiff* **Donald Doyle**
*individually, and on behalf*
*of all others similarly situated,*


By*: __/s/James Vlahakis_____*
James Vlahakis (lead counsel)
jvlahakis@sulaimanlaw.com

Ahmad T. Sulaiman
Omar T. Sulaiman

Mohammed O. Badwan
Nathan C. Volheim

SULAIMAN LAW GROUP, LTD.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 581-5456 telephone
(630) 575-8188 facsimile